# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

DEBRA G.,[1]

                          Plaintiff,

    vs.

ANDREW SAUL,
Commissioner of Social Security,

                          Defendant.          Case No. 3:19-cv-00026-SLG

## DECISION AND ORDER

On or about June 3, 2015, Plaintiff Debra G. filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"),[2] alleging disability beginning May 29, 2011.[3]  Ms. G. has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[4]  Ms. G.'s opening brief asks the Court to reverse and remand the agency decision.[5]  The Commissioner filed an Answer and a

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.  *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] The Court uses the terms "disability benefits" and "DIB" throughout the Decision and Order.

[3] Administrative Record ("A.R.") 268.  The ALJ decision cites May 29, 2015 as the application date for Ms. G.'s DIB claim.  A.R. 68.

[4] Docket 1 (Debra G.'s Compl.).  Ms. G. amended her Complaint on April 12, 2019.  Docket 9.

[5] Docket 20 (Debra G.'s Br.).

brief in opposition to Ms. G.'s opening brief.[6]  Ms. G. filed a reply brief on August 22, 2019.[7]

Oral argument was not requested and was not necessary to the Court's decision.  This

Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social

Security.[8]  For the reasons set forth below, Ms. G.'s request for relief will be denied.

## I.     STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned

unless it is either not supported by substantial evidence or is based upon legal error.[9]

"Substantial evidence" has been defined by the United States Supreme Court as "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."[10]  Such evidence must be "more than a mere scintilla," but may be "less than

a preponderance."[11]  In reviewing the agency's determination, the Court considers the

evidence in its entirety, weighing both the evidence that supports and that which detracts

from the administrative law judge ("ALJ")'s conclusion.[12]  If the evidence is susceptible to

---

[6] Docket 15 (Answer); Docket 21 (Defendant's Br.).

[7] Docket 22 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

more than one rational interpretation, the ALJ's conclusion must be upheld.[13]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which she did not rely."[14]  An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[16]   In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect her own interests.[17]

## II.    DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental

---

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[17] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

disability.[18]  In addition, SSI may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[19]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[20]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[21]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[22]  A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[23]  If a claimant establishes a prima

---

[18] 42 U.S.C. § 423(a).

[19] 42 U.S.C. § 1381a.

[20] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[21] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[22] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[23] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180

facie case, the burden of proof then shifts to the agency at step five.[24] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[25] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity." *The ALJ concluded that Ms. G. did not engage in substantial gainful activity during the period from her alleged onset date of May 29, 2011 through her date last insured of December 31, 2015.[26]*

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement. *Through the date last insured, the ALJ determined that Ms. G. had the following severe impairment: Meniere's disease. The ALJ determined that Ms. G.'s chronic back pain, history of migraines and trigeminal neuralgia, obesity, mild cognitive impairment, and depression and anxiety were non-severe impairments.[27]*

---

F.3d 1094, 1098 (9th Cir. 1999).

[24] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[25] *Tackett*, 180 F.3d at 1101.

[26] A.R. 70.

[27] A.R. 70–71.

**Step 3.** Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity. If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step. *Through the date last insured, the ALJ determined that Ms. G. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.*[28]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed. Once determined, the RFC is used at both step four and step five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not severe.[29] *The ALJ concluded that Ms. G. had the RFC to perform medium work except that she was additionally limited to standing and walking for four hours and sitting for up to six hours in an eight hour day; occasionally climbing ramps or stairs and never climbing ladders, ropes or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; avoiding moderate exposure to excessive noise; avoiding all exposure to unprotected heights; and avoiding moderate exposure to hazardous machinery.*[30]

_____

[28] A.R. 74.

[29] 20 C.F.R. § 404.1520(a)(4).

[30] A.R. 74.

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do her past relevant work, the claimant is deemed not to be disabled. Otherwise, the evaluation process moves to the fifth and final step. *Through the date last insured, the ALJ found that Ms. G. was capable of performing past relevant work as a service dispatcher and assembly worker.*[31]

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled. *Although the ALJ determined that Ms. G. was capable of past relevant work, she also determined that in the alternative, there were other jobs existing in the national economy that Ms. G. was also able to perform, including janitor, cleaner II, and laundry worker I.*[32]

The ALJ concluded that Ms. G. was not disabled at any time from May 29, 2011, the alleged onset date, through December 31, 2015, the date last insured.[33]

### III.   PROCEDURAL AND FACTUAL BACKGROUND

---

[31] A.R. 78.

[32] A.R. 79–80.

[33] A.R. 80.

Ms. G. was born in 1970, she is 49 years old.[34]  She reported last working in 2010 at Alaska Housewares "putting fish cans together."[35]  Ms. G. reported working as a night dispatcher, cleaner, and office assistant for a plumbing and heating company and as a newspaper deliverer in the past.  She also reported doing "secretarial work" at another plumbing and heating company and at an automated laundry and supply company.[36]

On December 30, 2015, the Social Security Administration ("SSA") determined that Ms. G. was not disabled under the applicable rules.[37]  On January 13, 2016, Ms. G. requested a hearing before an ALJ.[38]  On July 21, 2017, Ms. G. appeared and testified without a representative at a hearing held before ALJ Cecilia LaCara.[39]  On November 14, 2017, the ALJ issued an unfavorable ruling.[40]  On December 11, 2018, the Appeals Council denied Ms. G.'s request for review.[41]  Ms. G. appealed to this Court on January 31, 2019.[42]

*Medical Records*

---

[34] A.R. 268.

[35] A.R. 119, 277.

[36] A.R. 116–19, 300–303.

[37] A.R. 134–46.

[38] A.R. 160.

[39] A.R. 115–27.

[40] A.R. 65–80.

[41] A.R. 1–5.

[42] Docket 1.  *See supra n.* 5.  Ms. G. amended her Complaint on April 12, 2019.  Docket 9.

Although Ms. G.'s medical records date back to 2004, the Court focuses on the relevant medical records between the alleged onset date of May 29, 2011 and the date last insured of December 31, 2015.[43] However, the following are relevant records before May 29, 2011:

On September 9, 2008, Ms. G. had an MRI of her cervical spine. The MRI showed a right paracentral broad-based C5-6 disc bulges producing mild central canal and right neural foraminal stenosis. On the same date, Ms. G. had an MRI of her brain. The MRI showed "several tiny nonspecific foci of flair hyperintensity" that "most likely represent[ed] minimal early microangiopathy/chronic small vessel ischemia." The reading physician noted that "the differential diagnosis would include prior trauma and [the] possibility [of] multiple sclerosis."[44]

On January 27, 2009, Ms. G. saw Scott DeBerard, D.O., at Hillside Family Medicine. She reported having a "recurrence of vertigo" and that she had been having symptoms "for several months now." She also reported an unremarkable MRI and a neurological consultation "which failed to reveal significant pathology, symptoms attributable to [benign paroxysmal positional vertigo]." Dr. DeBerard prescribed Vicodin for pain and Phenergan for nausea.[45]

---

[43] There are multiple duplicate treatment notes in the Court's record. To the extent possible, the Court cites the first treatment note to appear in the medical record. Additionally, the Court's citations to the record are to the *corrected* Administrative Record at Docket 19.

[44] A.R. 529–30.

[45] A.R. 525.

On January 29, 2009, Dr. DeBerard wrote a letter stating that Ms. G. "has had nearly disabling vertigo for about 3 months" and that she had "seen a neurologist, had a head MRI, and had normal labs done recently."[46]

On February 17, 2009, Ms. G. initiated care with David Beal, M.D. She reported "disequilibrium, dizziness, imbalance, light-headedness, vertigo, tinnitus, headache, [benign paroxysmal positional vertigo], nausea, vomiting, blurred vision temporary with movement, panic attack, anxiety and pain in the ear right and left" that began in September 2008.[47] She reported that "the problem seems to be increasing." She also reported that she could do household activities "like cooking and cleaning"; was able to drive a car; and could attend to her own needs. On examination, Dr. Beal observed that "[o]n headshake nystagmus was not seen but the patient felt bad with head motion vertical and rotatory nystagmus noted when opening eyes horizontal." He noted a normal neurological exam with no tremor; 5/5 muscle strength in the lower and upper extremities; and a normal gait. Dr. Beal diagnosed Ms. G. with anxiety; headache; nausea with vomiting; laryngitis; larynx diseases; and dizziness/vertigo.[48]

On March 3, 2009, Ms. G. followed up with Dr. Beal to review balance tests. Dr. Beal diagnosed Ms. G. with cochleovestibular Meniere's disease and neuronitis.[49]

---

[46] A.R. 527.

[47] Ms. G. reported that eight years prior she had had "three severe episodes of vertigo without diagnosis." A.R. 422.

[48] A.R. 422–24.

[49] A.R. 421.

The following are the more relevant records after the May 29, 2011 alleged onset date:

On June 24, 2011, Ms. G. followed up with Dr. Beal. She reported vertigo attacks and that she "was let go from her job because of being to[o] forgetful as an accounting made a computer problem." On examination, Dr. Beal observed that Ms. G. was in no apparent distress with a normal examination of ears, nose, mouth, and throat. Dr. Beal assessed Ms. G. with active cochleovestibular Meniere's disease.[50]

On July 12, 2011, Ms. G. saw Dr. Beal. She reported experiencing episodic dizziness and pressure/fullness bilaterally in the ears, but more noticeable in the left ear. She also reported consistent ringing and sometimes buzzing. Dr. Beal assessed her with bilateral endolymphatic hydrops. Dr. Beal noted that Ms. G.'s audiogram test showed slight hearing loss in each ear at certain frequencies but "normal for the speech frequencies."[51]

On May 24, 2013, Ms. G. followed up with Dr. Beal. She reported dizziness, difficulty ambulating, ear fullness, ear pain, headache, nausea, otalgia, and loss of balance. Dr. Beal noted that Ms. G.'s left ear Meniere's disease was "not being controlled with diuretics, K+ replacement and a good low salt diet." Dr. Beal also noted that Ms. G. did not respond to steroid injections in the ears and had "trigeminal neuralgia with no response except with [V]icodan." On physical examination, Dr. Beal observed that Ms. G.

_____

[50] A.R. 396–97.

[51] A.R. 395, 432–36.

had a BMI of 31.95 kg/m2 and was tearful. He diagnosed Ms. G. with active cochleovestibular Meniere's disease and trigeminal neuralgia.[52]

On July 16, 2013, Ms. G. followed up with Dr. Beal. She reported tinnitus, pressure/fullness, and pain in both ears. She reported that the Meniere's symptoms caused her hearing to "shut[ ] down." On examination, Dr. Beal noted normal hearing in the right ear with slight loss at 250 Hz and 500 Hz and mild loss at 8000 Hz and slight loss throughout all frequencies in the left ear. He noted that the electrocochleography test showed an "impedance level [ ] within recordable limits." Dr. Beal also noted that Ms. G. was "scheduled for left ear endolymphatic shunt surgery next month."[53]

On August 21, 2013, Ms. G. underwent a left ear endolymphatic sac decompression with shunt placement.[54]

On August 29, 2013, Ms. G. saw Dr. Beal. On physical examination, Dr. Beal observed a positive Rinne test to the left and an equal Weber test.[55]

On September 17, 2013, Ms. G. followed up with Dr. Beal. She reported "doing a lot better" and that she had "some vertigo attacks but they lasted less long." Ms. G. also reported hearing loss in the left ear, but she felt "improved over her pre-surgery status."

---

[52] A.R. 393–94.

[53] A.R. 426–31.

[54] A.R. 386–88.

[55] A.R. 383.

On examination, Dr. Beal observed a normal external auditory canal and normal otoscopic exam.  Dr. Beal prescribed 90 tablets of 7.5/300 mg of Vicodin for 40 days.[56]

On October 4, 2013, Ms. G. initiated care with Irina Grimberg, M.D., at Primary Care Associates.   Ms. G. reported that she was applying for disability "based on severe dizziness from Meniere disease as well as C-spine DDD and L-spine DDD."  She reported becoming "agoraphobic/recluse due to these ailments."   She also reported she was on "long-term Vicodin for back pain and long-term Valium for dizziness associated with Meniere."  On physical examination, Dr. Grimberg observed a normal eye, ear, nose, and oropharynx exam; coarse breath "characteristic for a lifelong smoker"; a normal gait and station; and no apparent agitation or depression.   Ms. G.'s recorded weight was 206 pounds.[57]

On December 18, 2013, Ms. G. saw Dr. Beal.  She reported ear pain, hearing loss, dizziness, and nausea.  She also reported that the nausea had "gone down a great deal and ther[e] is not extended vertigo and she is much better since the operation."   She reported that her pain was sharp and occurred daily, but her symptoms were "mild and improving."  She reported less fatigue and that she was "getting things done around the house."   On physical examination, Dr. Beal observed that Ms. G. was well-groomed and happy with normal ENMT and head and neck examinations.[58]

_____

[56] A.R. 382.

[57] A.R. 378.

[58] A.R. 532.

On January 2, 2014, Ms. G. followed up with Dr. Grimberg. She reported a gradual weight gain and a "dry and nagging" cough. On physical examination, Dr. Grimberg observed a weight of 206 pounds; normal eye, nose, and oropharynx exams; and a normal FEV1/FVC ratio. Dr. Grimberg adjusted and refilled Ms. G.'s prescriptions for pain management, trigeminal neuralgia, exogenous obesity, and laryngopharyngeal reflux.[59]

On November 19, 2014, Dr. Beal wrote a letter on Ms. G.'s behalf. He noted that he saw Ms. G. "for care and treatment of chronic dizziness issues that cause symptoms of nausea and vomiting." He opined that "[d]ue to these symptoms it is imperative that while flying she sits next to her husband as he acts as her caregiver."[60]

On February 27, 2015, Ms. G. initiated care with Peter Montesano, M.D., at Medical Park Family Care. She reported anxiety and depression. On physical examination, Dr. Montesano observed that Ms. G. was "healthy-appearing" with a weight of 205 pounds and BMI of 32.1. He observed a "[s]lightly depressed mood and flattened [a]ffect"; a normal gait and station; and grossly normal coordination and cerebellum. He assessed Ms. G. with depressive disorder; anxiety; being overweight; and Meniere's disease. Dr. Montesano referred Ms. G. to Counseling Solutions of Alaska and refilled her Effexor medication for a history of depression and anxiety. He referred Ms. G. to Creed Mamikunian, M.D., for dizziness.[61]

---

[59] A.R. 377.

[60] A.R. 621.

[61] A.R. 704–07.

On or about March 13, 2015, Ms. G. saw Creed Mamikunian, M.D. He wrote a letter to Dr. Montesano regarding Ms. G.'s reported bilateral Meniere's disease. Ms. G. reported experiencing "brief episodes of dizziness which can occur 10–20 times per week but only last for one to two minutes." Dr. Mamikunian noted that "[e]very time she gets one of these episodes, she takes Valium 10mg which seems to make her better." Dr. Mamikunian also noted that Ms. G.'s recent audiogram from July 16, 2013 "shows that she only has a slight sensorineural hearing loss in the low frequencies of her right ear" and "a slight conductive hearing loss in the mid-frequencies of her left ear but overall, her audiogram was really very good and was not suggestive of somebody who has had Meniere's disease for many years." He commented that Ms. G. had "a history of bilateral Meniere's disease but her audiogram belies this fact" and that Ms. G.'s symptoms were "extremely unusual and atypical of someone with Meniere's disease." Dr. Mamikunian reported that Ms. G. "seem[ed] to think that her symptoms improved tremendously after Dr. Beals's endolymphatic sac decompression."[62]

On August 14, 2015, Ms. G. initiated care with Mark Lorenz, M.D., at ACENT. She reported having Meniere's disease. She reported that after left ear shunt placement, she had "episodes daily but only last[ing] a few seconds to a few minutes." She reported head spinning, nausea, and vomiting. She reported taking Valium for her "sense of imbalance" and Effexor. On physical examination, Dr. Lorenz observed "some fairly significant chronic imbalance" and signs of left vestibular paresis. He observed a normal Hallpikes; a broad-

---

[62] A.R. 709.

based gait, unable to do heel-toe; a 90 degree turn left on Fukuda at 15 steps; and "post headshaking right nystagmus." Dr. Lorenz opined that Valium had "substantially delayed [Ms. G.'s] compensation" and suggested Ms. G. be evaluated for physical therapy.[63]

On November 4, 2015, Ms. G. had an x-ray of the lumbar spine. The x-ray showed mild degenerative changes at L4-L5 and L5-S1.[64]

On November 9, 2015, Ms. G. saw Stanford Downs, M.D., at Neurological Consultants of Alaska. Ms. G. reported having three episodes of Meniere's in 2001 that returned in 2008 and continued since then. She reported that after Dr. Beal placed a shunt in the left ear in 2013, "things improved." She reported "the vertigo attacks currently are less violent, but they still occur three to five times per day." Ms. G. reported low back pain she had been managing with Vicodin, but that she was not currently taking Vicodin. She also reported neck pain, photophobia, and headaches "accompanied by vomiting and triggered by light, stress, and a lot of people talking to her all at once." On physical examination, Dr. Downs observed that Ms. G. was awake, alert, and oriented. He noted that on a "Mini-Mental Status Examination," Ms. G. scored 29/30. He observed that Ms. G. "does appear to be photophobic and wears sunglasses except when asked to take them off for portions of the examination when we have to see her eyes." Dr. Downs observed that Ms. G. regarded all visual fields; had sharp discs; had pupils equally round and reactive to light with full range and conjugate extraocular movements; had 5/5 motor

_____

[63] A.R. 735–37.

[64] A.R. 716.

strength in the upper and lower extremities with a normal heel and toe walk. He noted that Ms. G. had "a great deal of difficulty on tandum" and that her "Romberg was technically negative, although she did have a considerable amount of sway with eyes open or closed and no real change between them," but there was no drift. He observed that her face moved strongly symmetrically and her hearing was intact to finger tap and finger rub. Dr. Downs assessed Ms. G. with a mild cognitive impairment. He then stated, "[t]he patient reports what by description seems to be more likely to be inattention and hence not committing things to memory." He noted that Ms. G. reported "a lot of symptoms consistent with migraine which can cause inattention and also can disrupt memory formation on its own." Dr. Downs also noted that "Meniere's is a little outside my area of expertise but almost certainly would also be able to decrease attention span." Dr. Downs opined that although he did not think Ms. G. had "any sort of neurodegenerative intrinsic brain memory dysfunction, this sort of problem nonetheless can be quite debilitating." He assessed Ms. G. with "[i]ntractable migraine with aura without status migrainosus" and noted that although "[t]ypically migraines can be treated effectively," it was "unclear to me how much effort has been put into treating them." Dr. Downs assessed Ms. G. with Meniere's disease of both ears, but noted that "[s]ome of her 'Meniere's' symptoms may actually be migrainous in nature." He also noted that Ms. G.'s Meniere's symptoms "seem to be quite debilitating both directly as a result of the vertigo and also probably contributing to her perceived cognitive impairment."[65]

---

[65] A.R. 718–21.

On December 28, 2015, Dave Sanford, Ph.D., provided a review of Ms. G.'s medically determinable impairments for the Social Security Administration. Dr. Sanford determined that Ms. G.'s migraines were severe and her disorder of the back (discogenic and degenerative) and organic brain syndrome were non-severe impairments. He opined that Ms. G. did not meet or equal a listing and had only mild difficulties in maintaining concentration, persistence, or pace. Dr. Sanford noted that Ms. G.'s records "indicate that she does have some minor issues secondary to her physical health conditions where she experiences some mild [symptoms] that mirror psych issues."[66]

Also, on December 28, 2015, P. Michael O'Brien, M.D., provided an RFC. Dr. O'Brien opined that Ms. G. was limited to occasionally lifting and carrying 50 pounds; frequently lifting and carrying 25 pounds; standing/walking about six hours in an eight-hour workday; sitting about six hours in an eight-hour workday; never climbing stairs or ramps; occasionally climbing ladders, ropes, or scaffolds; and avoiding even moderate exposure to hazards.[67]

The following are the more relevant records after the date last insured of December 31, 2015:

On October 29, 2016, Ms. G. underwent several eye and ear exams.[68]

---

[66] A.R. 140–42.

[67] A.R. 142–45.

[68] A.R. 727–34. There is a hand-written note in the record that is illegible and no author is indicated. A.R. 727.

On November 7, 2016, Dr. Beal wrote an opinion letter. He noted that Ms. G. was a "patient for many years as she presented to me as a person having such severe dizziness, she was not able to function in any capacity as a worker, a wife, a mother or as a friend." He stated, "[t]he Meniere's disease was aggressively treated first with trans tympanic steroids and finally with a left endolymphatic hood shunt. This treatment worked to the extent she could get out of bed and work around the house, but there was residual imbalance and the likewise developed a severe trigeminal neuralgia in the post-op left ear." Dr. Beal noted that "[a] complete balance assessment over time demonstrated significant ear disease with some central abnormalities in the balance system." He stated that "[s]he was recently evaluated for the ongoing imbalance symptoms, which are severe enough; she is not able to work." Dr. Beal opined that "[d]ue to the objective findings, their prolonged occurrence and our inability to resolve these issues at this time; she is considered to be totally disabled."[69]

On December 29, 2016, Ms. G. followed up with Dr. Montesano. She reported a recent diagnosis of right-sided trigeminal neuralgia "which had her in bed for quite some time when combined with Meniere's disease. Dr. Belas [sic] determined her to be totally disabled." On physical examination, Dr. Montesano observed that Ms. G.'s PERRLA/EOM was intact and conjunctiva and sclera clear and without nystagmus. He observed that Ms. G.'s [tympanic membranes] were intact and clear with normal ear canals and "grossly normal hearing." Dr. Montesano observed normal sensation, reflexes, coordination,

---

[69] A.R. 724.

muscle strength and tone. He noted that Ms. G. was alert and cooperative with a normal mood and affect and normal attention span and concentration.[70]

The following records were submitted to the Appeals Council after the ALJ's November 14, 2017 decision:

On December 1, 2017, Ms. G. saw Thomas Kennedy, M.D., at Alaska Neurology Center for "an evaluation of abnormal eye movement." Ms. G. reported blurred vision, dull headaches, dull achy pain in both ears, stabbing pain behind the eyes, nausea, vomiting, bladder incontinence, and "headaches that last for days and hours to weeks associated with confusion [and] light sensitivity." Ms. G. reported photophobia and tinnitus, but no depressive symptoms or anxiety. Her weight was 163 pounds with a BMI of 27.12 kg/m2. Dr. Kennedy observed that Ms. G. had a "hostile affect," but was alert and oriented to person, place, and time. He noted that Ms. G.'s affect was "initially hostile then tearful and slightly depressed." On physical examination, Ms. G.'s extraocular eye movements were full and conjugate; her gross motor movement was intact; her coordination of upper and lower extremities was normal; and she was able to stand and sit without assistance. Dr. Kennedy ordered a brain MRI and sleep deprived EEG. He prescribed Topamax for trigeminal neuralgia and provided diet modification and supplement advice.[71]

On December 27, 2017, Ms. G. saw David Roberts, M.D., at Alaska Neurology Center. She reported high photophobia, poor sleep, and "issues with feeling

_____

[70] A.R. 755–58.

[71] A.R. 47–53.

'overwhelmed'." She also reported "poor control over her ocular movements." On physical examination, Dr. Roberts observed that Ms. G. was "[a]lert, attentive, conversant and coherent." He observed that her speech production and comprehension were intact; her recent and remote memory grossly intact; facial strength was intact and symmetric; hearing intact to voice; and her executive functions were performed well. He observed no abnormal involuntary movements. He noted Ms. G. walked with a steady, narrow-base gait, and normal stride length. He stated, "[i]t appears the patient has a condition called oscillopsia which cannot be seen on an MRI."[72]

*Hearing Testimony on July 21, 2017*

Ms. G. attended a hearing before ALJ LaCara on July 21, 2017 with representation. She testified that she last worked at Alaska Housewares "putting fish cans together." She indicated that the work made her dizzy. Ms. G. reported working in the past at Arctic Chain Plumbing and Heating as a night dispatcher. She reported that she also cleaned the offices and did "secretarial work" at Arctic Chain. Ms. G. testified that she worked at Alkota Plumbing and Heating, as a newspaper deliverer for Alaska Dispatch News, and at Automated Laundry Systems and Supply in 2008, 2009, and 2010. She testified that she was fired from Automated Laundry Systems and Supply for making "[t]oo many mistakes." Ms. G. testified that she lived with her husband, teenage daughter, and dog. She indicated that her husband woke her up at noon for lunch, she let the dog out, and "putter[ed] around the house." She testified that she experienced dizziness on a daily basis, vertigo on a

---

[72] A.R. 54–59.

monthly basis, and took Valium or diazepam daily to manage it. Ms. G. indicated that the dizzy spells lasted about one minute; she had three to five episodes a day; and she would lay down and rest after each episode. She indicated that she experienced "sharp pain in my ear or temple, and throughout the day, it just gets worse, to where I end up having a headache." She reported having difficulty chewing due to trigeminal neuralgia. She testified that her physicians would not give her pain medication. Ms. G. also testified that she did not grocery shop; had an expired driver's license, but she drove occasionally (including driving her daughter to work the week before the hearing); and could sweep, vacuum, and feed her dogs. She testified that she did not cook because "it's just too confusing to try to cook everything all at once." She testified that she did not take care of her finances and that her "eyes can't keep track of things." Ms. G. reported taking antidepressants for 17 years, but she had not been to a psychologist, psychiatrist, or to counseling.[73]

Jack LeBeau, M.D., testified as the medical expert. Based on his review of the record, Dr. LeBeau indicated that Ms. G.'s conditions included Meniere's disease, tobacco dependence, photophobia, degenerative disc disease without radicular impingement, tinnitus, chronic back pain, migraines, trigeminal neuralgia, dizziness, and depression. Dr. LeBeau opined that Ms. G.'s audiograms did not show "hearing loss so severe that you're going to have someone who has trouble understanding conversation or directions or . . . work-related sounds and language." He noted that Meniere's "is a disease of attacks, not

---

[73] A.R. 107–08, 115–27.

constant problems, and the attacks can be dealt with" and that "[m]ost people probably do wind up not being disabled or retired." He recommended seeing a specialist for trigeminal neuralgia. Dr. LeBeau opined that Ms. G.'s medically determinable impairments did not meet or equal a listing individually or in combination. He opined that Ms. G. could lift 10 pounds continuously and carry 10 pounds frequently; lift 20 pounds frequently and carry 20 pounds occasionally; sit six hours in an eight-hour workday; stand and walk two hours each in an eight-hour workday; occasionally climb stairs and ramps; never climb scaffolds and ladders; occasionally stoop, kneel, crouch, and crawl; never work at unprotected heights; occasionally work with mechanical parts; and should be protected from "severe noise." Dr. LeBeau also opined that Ms. G. should not operate a motor vehicle.[74]

Colette Valette, Ph.D., testified as the psychological medical expert. Based on her review of the record, Dr. Valette indicated that she would "categorize [the mild cognitive impairment diagnosis] as [an] undeterminable impairment." Dr. Valette noted that Dr. Downs assessed Ms. G. with a mild cognitive impairment and then took away the diagnosis "by saying, but really it's inattention that's causing memory problems."[75] She testified that Ms. G.'s diagnoses of depression and anxiety were "impairments that don't precisely satisfy the criteria required under the listings." Dr. Valette noted that Ms. G.'s depressive disorder and anxiety were each "diagnosed one time" and "no symptoms were

---

[74] A.R. 91–109.

[75] Dr. Downs assessed Ms. G. with a mild cognitive impairment. He then stated, "[t]he patient reports what by description seems to be more likely to be inattention and hence not committing things to memory." A.R. 720.

relayed."[76] Dr. Valette opined that Ms. G. had no limitations understanding, remembering, or implying information; no limitations interacting with others; no limitations concentrating, persisting, or maintaining pace; and no limitations adapting or managing herself.[77]

William Weiss testified as the vocational expert. Based on the ALJ's first hypothetical[78], he opined that Ms. G. could perform her past work, except the newspaper delivery job. VE Weiss also testified that there were other jobs an individual the same age, education, and work experience as Ms. G. could perform, including janitor, cleaner II, and laundry worker I. Based on the ALJ's second hypothetical,[79] VE Weiss opined that Ms. G. could perform her past work as a general office clerk and assembler. He also opined that

---

[76] Dr. Montesano diagnosed Ms. G. with depressive disorder and anxiety on February 27, 2015. A.R. 704–06.

[77] A.R. 109–14.

[78] The ALJ's first hypothetical was as follows:

Let's assume that we have an individual the same age, education and work experience as that of [Ms. G.] and who is limited to medium work. This person is limited to the occasional climbing of ramps and stairs. No climbing of ladders, ropes or scaffolds. This person is [ ] never to be exposed to unprotected heights and is limited to avoiding moderate exposure to the operational control of moving machinery and hazardous machinery. A.R. 129.

[79] The ALJ's second hypothetical was as follows:

For the second hypothetical, again we're looking at someone the same age, education and work experience as that of [Ms. G.], and who is now only limited to light work. This person can stand or walk a total of four hours in an eight-hour workday in any combination with the normal breaks and is able to sit for up to six hours in an eight-hour day with the normal breaks. This person is limited to the occasional climbing of ramps or stairs. No climbing of ladders, ropes or scaffolds. The occasional balancing, stooping, kneeling, crouching and crawling. This person is to avoid moderate exposure to excessive noise. Is to avoid all exposure to unprotected heights. And is to avoid moderate exposure to hazardous machinery and the operational control of moving machinery. A.R. 130–31.

an individual with the same age, education, and work experience as Ms. G. could perform work as a basket filler, garment sorter, and assembler. VE Weiss testified that if the hypothetical individual took three extra 20 minute breaks or missed three or more days of work in a month due to psychiatric or physical distractions or impairments, that person could not retain employment, unless it was a structured work setting.[80]

*Ms. G.'s Function Reports*

Ms. G. completed a function report on July 20, 2015. She reported that during the day she takes the dogs out, takes medications, and watches television until her husband comes home and makes lunch. She reported that she would try to pick up the house and do dishes. Ms. G. indicated that she had constant nausea, "mini spins," felt off balance, had blurred vision and headaches, and "knife stabbing pain" in her ears and jaw. She stated, "I am in pain daily, I always feel like I am going to vomit, dizzy spells." She reported making food and talking with her daughter and feeding her pets, but that her husband cooked, cleaned, did laundry, and helped their teenage daughter. Ms. G. indicated she had no problems with her personal care, but only did chores "if I feel okay; sometimes I don't finish." She reported that moving around and people and things moving around caused her to "start to spin." She reported that she could ride in a car, shop by mail, and take care of her finances, but she rarely went outside because she could not "control [her] environment." Ms. G. stated, "I don't know when a vertigo attack will happen so I don't like to leave my house anymore." She indicated that her conditions affected lifting, squatting,

---

[80] A.R. 127–33.

bending, standing, reaching, walking, kneeling, stair climbing, seeing, memory, completing tasks, concentrating, and understanding. Ms. G. also indicated that she needed sunglasses in bright rooms and outside.[81]

Also on July 20, 2015, Ms. G. completed a headache questionnaire. She indicated that she started having headaches in 1998, has two to three each week, and that the headaches were in the front and back of her head with nausea and blurred vision. She reported that medication "rarely works" and that she was unable to participate in activities during or after a headache.[82]

On July 20, 2015, Warren G., Ms. G.'s husband, completed a function report on Ms. G.'s behalf. He reported that Ms. G. tried to help him around the house during the day and took naps due to "having small attacks all day everyday." He indicated that Ms. G. did not assist with caring for any other persons or any pets. Warren G. reported that Ms. G. had no problems with personal care and could prepare cereal, but she did not cook. He indicated that Ms. G. did the dishes once or twice a month, but that he did "everything else." Warren G. reported that Ms. G. could ride in a car, did not go out alone, did not do the shopping, and did not pay bills or handle a savings account because she could not "drive to a place we owe money to and pay the bill because it [is] to[o] much movement." He reported that Ms. G. was good at following written and spoken instructions. He indicated that her conditions affected lifting, squatting, sitting, kneeling, stair-climbing,

---

[81] A.R. 304, 307–14.

[82] A.R. 305–06.

understanding, bending, talking, using hands, standing, hearing, completing tasks, reaching, seeing, getting along with others, concentration, memory, and walking. Warren G. stated, "she needs this so it lifts her spirits so she feels like a mom helping in some sort of way."[83]

## IV. DISCUSSION

Ms. G. is represented by counsel. In her opening brief, Ms. G. alleges that the ALJ "discounted [Dr. Downs's] opinion and medical source statement for invalid reasons because the agency was required to re-contact Dr. Downs rather than to discount his opinion." She asserts that additional evidence submitted to the Appeals Council "establishes that [Ms. G.'s] proper diagnosis is oscillopsia, which takes account of her migraine activity and explains the imbalance due to vertigo." She asserts that the ALJ's decision is not supported by substantial evidence and the VE's testimony was "based on [an] invalid [RFC] that does not account for the most that [Ms. G.] can do."[84] The Commissioner disputes Ms. G.'s assertions.[85] The Court addresses each of Ms. G.'s assertions in turn:

A. <u>Development of the Record</u>

Ms. G. asserts that the ALJ failed to fully and fairly develop the record by failing to re-contact examining consultant Dr. Downs "regarding the agency's concern about multiple

_____

[83] A.R. 291–99.

[84] Docket 20 at 14–24.

[85] Docket 21 at 5–14.

aspects of his medical source report."[86]  In response, the Commissioner contends that the ALJ "provided multiple reasons for discounting Dr. Downs's opinion, any error as to one reason would be harmless, in light of the other proper reasons."[87]

The ALJ has an "independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[88]  An "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."[89]  The agency must contact a consultative examiner for additional information or a revised report if the examiner's report is "inadequate or incomplete."[90]  A report should "provide[ ] evidence which serves as an adequate basis for decisionmaking in terms of the impairment it assesses" and the absence of a medical source statement "about what you can still do despite your impairment(s)" will not make a consultative examination report incomplete.[91]

Although the ALJ characterized Dr. Downs's opinion as "vague" and pointed out that it did not provide any specific workplace limitations, Dr. Downs's report nonetheless served

---

[86] Docket 20 at 16.

[87] Docket 21 at 9.

[88] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001) (internal citations and quotations omitted).

[89] *McLeod v. Astrue,* 640 F.3d 881, 885 (9th Cir. 2011) (internal citations omitted).

[90] 20 C.F.R. §§ 404.1519p(b) (2000).

[91] 20 C.F.R. § 404.1519p(a)(1) (2000); § 404.1519n(c)(6) (applied to claims filed before March 27, 2017).

as an adequate basis for decision-making in terms of the impairments it assessed.  Dr. Downs provided a detailed past medical history; documented Ms. G.'s subjective complaints; assessed Ms. G. with mild cognitive impairment; and also noted that Ms. G. reported "a lot of symptoms consistent with migraine which can cause inattention and also can disrupt memory formation on its own."  He documented a mini mental status exam score of 29/30.  On physical examination, Dr. Downs observed pupils equally round and reactive to light with full range and conjugate extraocular movements; 5/5 motor strength in the upper and lower extremities with a normal heel and toe walk; "a considerable amount of sway with eyes open or closed and no real change between them," but no drift; strongly symmetrical face movements; and intact hearing.[92]  Treatment notes throughout the record reveal Ms. G. had normal eye, nose, and oropharynx exams; full and conjugate eye movements; normal gross motor movement, strength, and coordination of upper and lower extremities; some hearing loss; and a normal gait.[93]  The evidence was not incomplete or ambiguous.  Therefore, the ALJ was not required by the regulations to re-contact Dr. Downs regarding his consultative examination.

B.    Dr. Downs's Medical Opinion

Ms. G. alleges that ALJ erred by discounting Dr. Downs's opinions "with 'little weight' preferring other doctors instead, including non-treating, non-examining Dr. LeBeau as well

---

[92] A.R. 718–21.

[93] *e.g.,* A.R. 378, 422–24, 426–31, 383, 532, 704–07, 709, 755–58.

as psychologist Dr. Valette, who was non-treating, non-examining, too."[94]   The Commissioner contends that the ALJ "properly evaluated Dr. Downs's opinion."[95]

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[96]  Medical opinions come from three types of sources: those who treat the claimant; those who examine but do not treat the claimant; and those who neither examine nor treat the claimant.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[97]  In the Ninth Circuit, "[t]o reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."[98] When "a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence."[99]   This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  In disability benefits cases, physicians "may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability — the claimant's

---

[94] Docket 20 at 16–17.

[95] Docket 21 at 5–9.

[96] 20 C.F.R. § 404.1527(c).  This section applies to claims filed before March 27, 2017.

[97] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[98] *Trevizo v. Berryhill,* 871 F.3d 664, 675 (9th Cir. 2017) (internal citations omitted).

[99] *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017).

ability to perform work."[100]

The opinions of agency physician consultants may be considered medical opinions, and their findings and evidence are treated similarly to the medical opinion of any other source.[101] "The weight afforded a non-examining physician's testimony depends 'on the degree to which he provides supporting explanations for his opinions.'"[102] Greater weight may also be given to the opinion of a non-examining expert who testifies at a hearing because he is subject to cross examination.[103]

In this case, Dr. Downs was an examining physician. His opinion that Ms. G's condition was debilitating was contradicted by examining physician Dr. Mamikunian, testifying Drs. LeBeau and Valette, and the SSA reviewing physician, Dr. O'Brien.[104] Therefore, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for discounting Dr. Downs's opinion.

In her determination, the ALJ discussed Dr. Downs's opinions. She discounted Dr. Downs's opinion that Ms. G.'s "condition was debilitating both directly as a result of the vertigo and also probably contributing to her perceived cognitive impairment" for the following reasons: (1) the opinion was "very vague;" (2) Dr. Downs "did not provide any

---

[100] *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) (internal citations omitted).

[101] 20 C.F.R. §§ 404.1513a(b), 416.913a(b).

[102] *Garrison,* 759 F.3d at 1012.

[103] Andrews v. Shalala, 53 F.3d 1035, 1042 (citing Torres v. Secretary of H.H.S., 870 F.2d 742, 744 (1st Cir. 1989)).

[104] A.R. 92–109, 142–45, 709, 720–21.

specific work place limitations;" (3) Dr. Downs's use of "the term debilitating to describe the subjective symptoms" reported by Ms. G.; (4) Ms. G.'s symptoms were not supported by the objective medical evidence; and (5) Dr. Downs stated that Meniere's disease was "a little outside my area of expertise."[105]

An ALJ may reject an examining physician's opinion when it conflicts with the physician's own treatment notes.[106] As set forth above, Dr. Downs's physical examination findings do not support his opinion that Ms. G.'s condition was debilitating.[107] Additionally, an ALJ may consider a physician's area of specialization.[108] Here, Dr. Downs was a neurologist that performed a neurological examination. He noted specifically that Meniere's disease was outside of his area of expertise.[109] Further, the opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.[110] At the July 2017 hearing, Dr. LeBeau reviewed Dr. Downs's neurological

---

[105] A.R. 75–76, 719–20.

[106] *Valentine v. Comm'r of Soc. Sec.,* 574 F.3d 685, 692–93 (9th Cir. 2009).

[107] A.R. 719–20. *See supra n.* 89.

[108] Factors relevant to evaluating any medical opinion include: (1) the examining or treating relationship; (2) the consistency of the medical opinion with the record as a whole; (3) the physician's area of specialization; (4) the supportability of the physician's opinion through relevant evidence; and (5) other relevant factors, such as the physician's degree of familiarity with the SSA's disability process and with other information in the record. 20 C.F.R. § 404.1527(c). This section applies to claims filed before March 27, 2017.

[109] A.R. 719–20.

[110] *Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002).

examination and Ms. G.'s history of Meniere's.  Dr. LeBeau noted that Meniere's "is a disease of attacks, not constant problems, and the attacks can be dealt with" and that "[m]ost people probably do wind up not being disabled or retired."  He also noted that Ms. G.'s Meniere's episodes were "not near as severe as they used to be."[111]  In the medical record, Ms. G. reported improvement in her vertigo symptoms after an August 2013 left ear shunt surgery.[112]  Her eye, nose, and oropharynx exams were normal in most treatment notes.[113]  Her neurological examinations were normal.[114]

Dr. Valette indicated that based on her review of the longitudinal record, she would "categorize [the mild cognitive impairment diagnosis] as [an] undeterminable impairment." Specifically, Dr. Valette noted that in Dr. Downs's report, he diagnosed Ms. G. with a mild cognitive impairment and then opined that inattention was causing Ms. G.'s memory problems.[115]  As noted by the ALJ, Dr. Downs provided a neurological evaluation and the diagnosis of mild cognitive impairment was outside this scope.[116]  Further, the medical record does not show a cognitive impairment diagnosis by any other physician.

---

[111] A.R. 94–97.

[112] A.R. 532, 709, 736.

[113] A.R. 378, 382, 396, 532.

[114] A.R. 50–51, 422–24, 719–20.

[115] A.R. 111, 113, 720.  Dr. Downs summarized, "[c]onsequently, I believe it is not so much that she has true cognitive impairment as she is distracted and inattentive due to her medical problems."  A.R. 720.

[116] A.R. 76, 718–21.

Although Ms. G. argues that "[p]ain is subjective, and to that extent is a complaint that is assessed by any doctor within the realm of their expertise and training" and "Dr. Downs was capable of assessing pain in Ms. [G.]," Dr. Downs did not note pain behaviors upon examination. For example, Dr. Downs observed that Ms. G. was in "no distress" and was "awake, alert and oriented." She scored 29/30 on a mental status exam taken at the visit and had no abnormal movements. Dr. Downs concluded Ms. G. was "distracted and inattentive due to her medical problems," but noted that her pain, migraines, and/or Meniere's could be the cause.[117]

For the foregoing reasons, the Court finds that the ALJ provided specific and legitimate reasons for discounting Dr. Downs's work opinion.

C. Additional Evidence

In its decision, the Appeals Council noted that Ms. G. submitted medical records from: (1) David Beal, M.D., dated July 16, 2013 to November 5, 2016; (2) medical evidence from Thomas Kennedy, M.D., dated December 1, 2017; and (3) medical evidence from David Roberts, M.D., dated December 18, 2017. The Appeals Council determined that this evidence did not "show a reasonable probability that it would change the outcome of the decision" and the Council did not "exhibit this evidence."[118]

Ms. G. asks the Court to weigh the additional evidence regarding Dr. Roberts's oscillopsia diagnosis in 2017. She alleges that the "additional evidence establishes that

---

[117] A.R. 719–20.

[118] A.R. 2.

[Ms. G.]'s proper diagnosis is oscillopsia, which takes account of her migraine activity and explains the imbalance due to vertigo."[119]

When the Appeals Council declines review, its decision is not subject to judicial review and "the ALJ's decision becomes the final decision of the Commissioner."[120] However, a court considers the additional evidence, "which was rejected by the Appeals Council, to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error."[121]

In this case, it does not appear that Dr. Roberts definitively diagnosed Ms. G. with oscillopsia. Dr. Roberts noted that Ms. G. reported "poor control over her ocular movements," but on physical examination, Dr. Roberts documented only that photophobia was reported and that the "[p]atient wears sunglasses." Further, although Dr. Roberts stated, "[i]t appears the patient has a condition called oscillopsia which cannot be seen on an MRI," the record does not show that Dr. Roberts prescribed medication or a treatment plan specific to oscillopsia.[122] He ordered a neuropathy panel, prescribed Vitamin D3,

---

[119] Docket 20 at 20–21, 58.

[120] *Taylor v. Comm'r of Soc. Sec. Admin.,* 659 F.3d 1228, 1231 (9th Cir. 2011); *see Klemm v. Astrue,* 543 F.3d 1139, 1144 (9th Cir. 2008) ("The Social Security Act grants to district courts jurisdiction to review only 'final decisions' of the Commissioner.") (citing 42 U.S.C. § 405(g))).

[121] *Id.* at 1232. *See also Brewes v. Comm'r of Soc. Sec. Admin.,* 682 F.3d 1157, 1163 (9th Cir. 2012) ("[W]e hold that when the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence.").

[122] *Ukolov v. Barnhart,* 420 F.3d 1002, 1006 (9th Cir. 2005) ("Dr. Nilaver reported Ukolov's subjective complaints, including 'gait ataxia,' balance problems, dizziness, 'limitations with

recommended other vitamin supplements, and recommended Ms. G. return to the clinic in six months to follow up.[123]

Additionally, the ALJ evaluated Ms. G.'s migraine and imbalance symptoms in her decision. For example, the ALJ considered Ms. G.'s reports that her vertigo, photophobia, and headaches triggered by light, smells, and stress and accompanied by nausea improved after left endolymphatic sac decompression by Dr. Beal. The ALJ noted that the treatment records showed the trigeminal neuralgia was treated with Vicodin and that Ms. G. was not taking pain medications or seeing a neurologist for treatment of the trigeminal neuralgia. She considered Dr. LeBeau's testimony that the medical records showed a history of trigeminal neuralgia and that there was "no objective explanation regarding the photophobia." She weighed the opinion evidence of Ms. G.'s treating and examining physicians regarding Ms. G.'s hearing loss, vertigo and imbalance symptoms, and migraine symptoms.[124]

Thus, considering the record as a whole, including Dr. Roberts's treatment notes, the ALJ's decision was supported by substantial evidence and free from legal error.

---

regards to sustained ambulation,' and 'increased tendency to fall.' These portions of the records do not support a finding of impairment because they are based solely on Ukolov's own 'perception or description' of his problems."); *see also* SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996) (A medical opinion offered in support of an impairment must include symptoms [and a] diagnosis).

[123] A.R. 56, 58.

[124] A.R. 71–78.

D.  <u>The RFC and VE Testimony</u>

Ms. G. alleges that "[t]he agency decision is the product of reversible errors of law and is not supported by substantial evidence because it fails to take account of the most that [Ms. G.] can do now that she is properly diagnosed with oscillopsia." She also asserts that "[b]ecause the residual functional capacity is the product of errors of law, and is not supported by substantial evidence, the vocational expert witness testimony is not supported by substantial evidence."[125]

A court should affirm an ALJ's determination of a claimant's RFC "if the ALJ applied the proper legal standard and his decision is supported by substantial evidence."[126]  In assessing an RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"[127]  It is "proper for an ALJ to limit a hypothetical to those impairments that are supported by substantial evidence in the record."[128]  But, "an RFC that fails to take into account a claimant's limitations is

_____

[125] Docket 20 at 22–24.

[126] *Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005) (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)).

[127] *See* SSR 96-08p, *available at* 1996 WL 374184 at *5; 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'").

[128] *Osenbrock v. Apfel,* 240 F.3d 1157, 1165 (9th Cir. 2001) (citing *Magallanes v. Bowen,* 881 F.2d 747, 756-57 (9th Cir. 1989) ("the ALJ was free to accept . . . that the claimant's depression was mild and would not significantly interfere with the performance of work related activities.")).

defective."[129]   When posing a hypothetical question to a VE, the ALJ's "depiction of the claimant's disability must be accurate, detailed, and supported by the medical record."[130] And, "[h]ypothetical questions asked of the vocational expert must 'set out all of the claimant's impairments.'"[131]

In this case, the ALJ took Ms. G.'s limitations into account in determining the RFC. It is unclear from the medical record from Dr. Roberts that he made an actual diagnosis of oscillopsia.[132]   And, even without the formal diagnosis, the ALJ evaluated Ms. G.'s symptoms and reports of imbalance, migraines, nausea, vertigo, and headaches.  The ALJ assessed treatment notes, the objective evidence, and physician opinions regarding those symptoms.[133]  The ALJ's hypothetical questions posed to VE Weiss included an RFC for medium work with limitations and an RFC for light work with limitations.[134]

For the foregoing reasons, the RFC and the ALJ's step four and step five findings are supported by substantial evidence and free of legal error.

//

//

---

[129] *Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 690 (9th Cir. 2009).

[130] *Tackett v. Apfel,* 180 F.3d 1094, 1101 (9th Cir.1999).

[131] *Lewis v. Apfel,* 236 F.3d 503, 517 (9th Cir.  2001) (internal citation omitted).

[132] A.R. 58.

[133] A.R. 71–78.

[134] A.R. 129–31.

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are free from legal error and supported by substantial evidence in the record as a whole. Accordingly, IT IS ORDERED that Ms. G.'s request for relief at Docket 20 is DENIED as set forth herein and the Commissioner's final decision is AFFIRMED.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 4th day of February, 2020 at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE